```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           11 Cr. 487 (RJS)

 5   RONNIE GONZALEZ,

 6              Defendant.
                                            Resentenc
 7   ------------------------------x

 8                                          New York, N.Y.
                                            February 15, 2023
 9                                          11:15 a.m.

10   Before:

11
                       HON. RICHARD J. SULLIVAN,
12

13                                          Sitting by Designation

14                             APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  THANE RHEN
17        Assistant United States Attorney

18   DAVID PATTON
     FEDERAL DEFENDERS OF NEW YORK
19        Attorney for Defendant
     BY:  MICHAEL ARTHUS
20

21

22

23

24

25
```

1              (Case called)

2              THE COURT:  Good morning.  I'll take appearances.

3    From the government.

4              MR. REHN:  Good morning, your Honor.  Thane Rehn

5    appearing for the United States.

6              THE COURT:  Mr. Rehn, good morning.

7              For the defendant.

8              MR. ARTHUS:  For Mr. Gonzalez, Michael Arthus for

9    Mr. Gonzalez.

10             THE COURT:  Mr. Gonzalez, good morning to you.  We

11   have some friends and family members here.  So welcome.  This

12   is a public courtroom.  So everybody is welcome here.  I know

13   your presence means a great deal to Mr. Gonzalez.  So I thank

14   you for taking the time.

15             I'll try to make sure I explain everything that's

16   happening to you so that you can understand.  This case has a

17   long history, which some of you may be aware of.  We're going

18   to talk about that history and talk about the various

19   submissions that have been made to the Court in connection with

20   sentencing.  But I'll try tom make sure that we don't talk

21   through a lawyers' code so that you can understand what's

22   taking place.  So thank you.

23             Some of you wrote letters.  So I thank you for those

24   as well.  It's always helpful to receive letters from people

25   who know an individual best.  I have a long history with

1    Mr. Gonzalez going back over a decade now, but I don't claim to

2    know him best.  There are other people who know him better.  I

3    haven't seen him in many years.

4            I want to, first of all, go over with everybody what

5    I've received and reviewed in connection with sentencing.  I've

6    reviewed all the sentencing materials that were submitted back

7    in 2013 or 2012 and 2013 for the first sentencing.  I've also

8    reviewed the transcript of that sentencing and the judgment.

9            More recently, I have reviewed the sentencing

10   submission of the government which is dated February 1, which

11   is only three pages, single spaced, but it also includes the

12   prior submission which, again, I've already read.

13           And then I have the submission of February 8 from

14   defense counsel which 19 pages, single paced.  And then it also

15   includes a number of attachments, including a letter from

16   Mr. Gonzalez.

17           I've reviewed all of those materials.  Those materials

18   include some other letters as well as some other records dating

19   back to the '80s and '90s when Mr. Gonzalez was a student, just

20   a young kid.  So I've read all of those materials.

21           The government hasn't responded to that letter; is

22   that correct?

23           MR. REHN:  That's correct, your Honor.

24           THE COURT:  So you're agreeing with the legal

25   analysis?

1          MR. REHN:  No, your Honor.  We're planning to address

2     that.

3          THE COURT:  All right.  I've also reviewed of course

4     the presentence report that was repaid by probation, which is a

5     revised presentence report.  And I also got some updated

6     information about just the violations and programs and other

7     things that are alluded to in the defense letter.  I got some

8     specifics that are not referenced in that letter.  So I'll

9     mention that in a moment.

10         Is there anything else that I should be aware of or

11    that was submitted that I haven't mentioned?

12         MR. REHN:  No, your Honor.  I do want to make one

13    note, which is I received a phone call from chambers a few days

14    ago asking about whether the victims' family was going to be

15    here.

16         THE COURT:  That was going to be my next question.

17    The family members of a victim have a right to be heard and

18    certainly a right to be notified of proceedings like this one.

19    So the victim in this case, Mr. Garcia, who was killed -- I

20    don't know whether his family members have been contacted about

21    this proceeding.

22         Have they?

23         MR. REHN:  They have not, your Honor.  We made

24    attempts to contact them.  We don't have current contact

25    everything.  Everybody who worked on this case at our office is

1    gone.  Our current witness database doesn't have current

2    contact information, and we were unable to make contact with

3    them in advance of today's proceeding.

4            THE COURT:  When did you start trying?

5            MR. REHN:  I started trying after I received the call

6    from chambers.

7            THE COURT:  That was a couple of days ago.

8            MR. REHN:  That's correct, your Honor.

9            THE COURT:  So there was no attempt to reach out to

10   family members prior to that?

11           MR. REHN:  That's correct, your honor.

12           THE COURT:  There's a federal statute that basically

13   requires this; right?

14           MR. REHN:  Yes, your Honor.  It was an oversight on my

15   part.  And after receiving the inquiry from the Court, we

16   attempted to do what we could, based on the information we had,

17   and we were unable to do that this week.

18           THE COURT:  The inquiry from chambers was to see if

19   anybody wanted to speak.  But my assumption is that the

20   government understands its obligations and understands that

21   with respect to cases where there are victims, they understand

22   they need to reach out to those folks.

23           You're asking me to impose the same sentence as before

24   but the victims don't merit sort of consideration.  I'm pretty

25   stunned by this.  I'm not sure what to do, frankly.  I'm not

1    sure whether I should be adjourning this -- Mr. Gonzalez's

2    family is here and rightly so.  They have a right to be here

3    and want to be here.

4           I'm not sure whether Mr. Garcia's family wants to be

5    here, but they sure do have a right to be here.  It doesn't

6    seem like a great effort was made to contact them.  But for a

7    call from chambers to figure out whether anybody was going to

8    be here speaking, it sounds like no efforts at all would have

9    been made.

10          That is not the way this is supposed to go.  There's

11   another sentencing next week involving a coconspirator.  So it

12   seems to me that the efforts ought to be continuing, even if

13   you have not had success so far.  In this day and age,

14   especially with all the resources that the government has, it

15   should not be that hard to find the family members of the young

16   man who was killed.  He had family members.  We know that.

17          What do you propose, Mr. Rehn?

18          MR. REHN:  Your Honor, we did attempt to identify

19   whether we had any current contact information.  We do not.  I

20   don't know that the law requires additional efforts by the

21   government.

22          If the Court wants to instruct the government to

23   engage in additional efforts to attempt to contact the family

24   members --

25          THE COURT:  You have to attempt to contact family

1    members.

2         Wouldn't you say?  What do you think the law requires?

3         MR. REHN:  I don't have a copy of the statute in front

4    of me, your Honor.  But I believe generally speaking,

5    reasonable efforts to ensure that victims are aware of the

6    proceeding.

7         THE COURT:  So what would efforts be in a case that

8    has been scheduled for months?

9         MR. REHN:  Your Honor, I believe that given the age of

10   this proceeding, I don't know that the law requires more than

11   attempting, based on the information the government has as of

12   the time of the original prosecution, to identify the victims.

13   I don't know that there are any requirements for additional

14   investigative steps to determine whether those victims are

15   still around, whether they are able to participate in the

16   proceeding.

17        THE COURT:  You made no effort to contact them at all;

18   right?  Until what?  A day ago?  Two days ago?

19        MR. REHN:  That's correct, your Honor.  To be clear,

20   it's because we don't have the information that we would need

21   to be able to contact them and conduct additional investigative

22   steps to try to be able to find them.  I don't believe the law

23   requires that.  There are many cases where we're aware that

24   victims exist, but we don't necessarily undergo a new

25   investigation to find them at the time of a resentencing.

1          THE COURT:  It's rare that somebody gets a new

2    sentence a decade later.  That's an unusual set of facts.  The

3    government has known about this sentencing for months.

4          Right?

5          MR. REHN:  I believe the sentencing was scheduled in

6    the last fall.  Yes, your Honor.

7          THE COURT:  So there was ample time to figure out

8    whether the young man's family wishes to be heard.

9          Mr. Arthus, your thoughts on this?

10         MR. ARTHUS:  I don't know that I can speak directly to

11   the government's efforts here.  But I would just note for the

12   record that I believe the victim's family did not speak at the

13   initial sentencing.  So that may also be a factor to be

14   considered here, for what that's worth.

15         We're prepared obviously to proceed today.  We brought

16   his family in.

17         THE COURT:  I'm just looking at the statute.  Victims

18   have the right to be reasonably heard at any public proceeding

19   in the district court involving release, plea, sentencing, or

20   any parole proceeding.  That includes the right to be treated

21   with fairness and with respect.  And it also requires generally

22   that they be informed in a timely manner of proceedings.

23         So not ideal.  Let's proceed, and I can see -- maybe

24   there will be other issues that come up along the way too.  So

25   we'll see.

1              All right.  The presentence report was prepared by the

2    probation department.  That's done in all sentencings.  In this

3    case, there was a revised presentence report.

4              Mr. Arthus, you've received a copy of the report.  I

5    know you have because you've alluded it to it in your

6    submission.

7              Did you discuss it with your client?

8              MR. ARTHUS:  Yes, we have.

9              THE COURT:  You do have objections to what's in the

10   report.  I know that.

11             MR. ARTHUS:  Yes.  We do.

12             THE COURT:  So beyond the guidelines calculation

13   objections that are discussed at length in your letter, are

14   there any other objections that are not in the report or that

15   are sort of discreet factual objections?

16             MR. ARTHUS:  Yes.  I think everything has been

17   addressed at this point.

18             THE COURT:  Let me just remind Mr. Gonzalez.

19             Mr. Gonzalez, when I told you when I sentenced you the

20   last time -- and I think I even told you before that -- there

21   are number of different factors that a judge has to consider

22   when fashioning a sentence.

23             One of those factors is the United States Sentencing

24   Guidelines.  And that's, as I told you before, a big book.

25   This is the current version.  It's a book that is about 500

1    pages long that is prepared by the United States Sentencing

2    Commission which is a group of kind of experts in the fields.

3    It's lawyers and judges who are tasked with helping to update

4    this book, which is designed to give guidance to judges like me

5    who have to impose sentences on individuals.

6           So the way it works is that for every crime or type of

7    crime, there's a chapter in this book, and the judge is

8    directed to go to that chapter and to make certain findings as

9    directed under the book.  That book then assigns numbers or

10   values based on the type of crime and the characteristics of

11   that crime.

12          And so the judge goes through that process of adding

13   and, in some cases, subtracting points.  The judge then comes

14   up with a number.  That number is referred to as the offense

15   number.

16          The judge then does another calculation, based on

17   another chapter in this book, where there is a criminal

18   history.  And not surprisingly, people who have prior

19   convictions, people who have previously been sentenced to

20   prison, they will typically be treated more harshly than

21   someone who is here for a first offense.

22          So the judge will go through the book, make findings

23   about whether there were prior convictions, if so, when they

24   were.  And based on that, the judge then assigns points and

25   comes up with another number.

1          That number is referred to as the criminal history

2     category.  There are six criminal history categories.  Category

3     I is the lowest and least serious.  category VI is the highest

4     and most serious.

5          The judge then has those two numbers that I talked

6     about, the offense level on the one hand, the criminal history

7     category on the other.  And then, based on that, the judge then

8     goes the back of this book where there's a chart.  It's kind of

9     like accounting really.

10         But there's a chart here that has the offense level

11    going down from 1 all the way down to 43 here on the left.  And

12    then it's got the criminal histories going across from category

13    I all the way to category VI on the far right.

14         The judge basically goes down to the offense level,

15    goes over to the criminal history category, and where the

16    judge's finger finally stops on the chart, well, that is the

17    range that, in the view of the commission that prepared this

18    book, would be appropriate.

19         So it sounds pretty technical.  It is pretty

20    technical.  But it is important.  It's something judges are

21    directed to do in virtually every case.  So I will do that

22    here, recognizing -- I should mention that this book is not

23    mandatory.  I'm not required to follow this book.  I have to

24    make my findings.  I have to announce what the range is, but

25    I'm free to go above or below the range as I deem appropriate.

1          There are other factors that I also will consider.

2     I'll mention those in a minute.  But for now, we're going to

3     spend a little time talking about this book and how it applies

4     in this case because I think there are some disagreements

5     between the parties about it.

6          So I guess to boil it down to its essence, the

7     probation department and the government argues that the offense

8     level should be level 43 because this crime or these crimes,

9     which involved an attempt to commit a robbery and conspiracy to

10    commit robbery, resulted in a death, the murder of a young man.

11    He was the target of the robbery.  He was killed during the

12    course of that robbery.

13         And so there's a section under the guidelines for

14    robbery that says if there was a murder, you then apply the

15    guidelines for murder which puts you all the way at the top of

16    the offense level at level 43.

17         So, Mr. Arthus, you have written a pretty lengthy

18    submission that I guess challenges both the probation

19    department's view of the guidelines and the government's which

20    is set forth in their letter.  I think what might make sense is

21    to hear the government's response to your letter, and then I'll

22    give you a chance to certainly respond.

23         And we may go a couple of rounds on this.  Let me just

24    say to the folks here this can be quite technical.  That

25    doesn't mean it's not important.  It might be a little tricky

1    to follow.

2          But we're going to be talking about prior cases.

3    We're going to be talking about the language in this book and

4    trying to make sure that at least I feel that I have enough

5    information and enough authority, based on precedence and based

6    on the language in this book, to make this determination.  So

7    be ready for what is potentially a very technical conversation

8    but nonetheless an important one.

9          Mr. Gonzalez, if at any point, you've got any

10   questions, let me know.  Okay?  You're the main event here.

11   It's really public.  I want to make sure your family

12   understands what's going on.  Members of the public can come

13   in.  I want to make sure they can understand what's going on.

14   But I mostly want to make sure that you understand what's going

15   on.

16          So if at any point you have difficulty following

17   what's taking place and you want me to just explain it or take

18   a minute so you can talk to your lawyer, that is perfectly

19   fine.

20          We're in no rush.  This is a very important event in

21   your life.  It's a very important day in the lives of a lot of

22   other people, including the people here, but others too.  It's

23   a very important event in the life of the Court.  There's

24   nothing I'm going to do today that's more important than this.

25   I can assure you.

1           So we're going to take as much time as we need.  And

2     on occasion -- I'll just warn you.  There are times when I will

3     put this over because I don't feel that I have enough

4     information or I feel that I need more time to reflect on what

5     with I heard.

6           I hope that won't be the case because folks took off

7     time to be here today.  But that does sometimes happen, just so

8     you understand that's how important I take this and how

9     important this day is and this process is.

10          Let's hear from Mr. Rehn with respect to the

11    guidelines calculation and particularly the felony murder or

12    the murder cross-reference in 2B3.1.

13          MR. REHN:  Certainly, your Honor.  So I think by way

14    of background, as the Court is well aware, at the first

15    sentencing, the defendant was assigned the murder guideline.

16    There was no objection that at that time.  There was no

17    objection on appeal.  And we would first submit --

18          THE COURT:  He was convicted Title 18 Section 924(j).

19          MR. REHN:  That's correct, your Honor.

20          THE COURT:  That had its own guideline.  Right?

21          MR. REHN:  They still had to apply the murder

22    reference to the guidelines, and there was no objection at that

23    time.  I'm not sure if that necessarily constitutes a

24    forfeiture.

25          THE COURT:  This is a new sentencing.  So I don't know

1    that it would constitute a forfeiture.

2            MR. REHN:  The purpose of the resentencing is to

3    resentence in light of the Supreme Court's decision in *Taylor*.

4            THE COURT:  You don't think I can even consider what

5    he's been doing over the last ten years.

6            MR. REHN:  Certainly the Court can consider --

7            THE COURT:  Well, why would I be able to consider

8    that?

9            MR. REHN:  -- that in 3553(a) factors.  The argument

10   that's with regard to the application of the guidelines we

11   would submit are not warranted.

12           THE COURT:  What's your basis for saying that?  What

13   authority do you have?

14           MR. REHN:  Well, the defense had every opportunity to

15   raise those objections.

16           THE COURT:  No.  No.

17           What's your basis for saying that have forfeited it?

18   Are you citing some cases?

19           MR. REHN:  I'm citing the general principle of

20   forfeiture.  Generally speaking, in the law, an argument not

21   raised in a proceeding where there is an opportunity to raise

22   it is deemed forfeited.  I don't see a reason to depart from

23   that principle here.

24           THE COURT:  And that principle applies on a

25   resentencing?

1              MR. REHN:  Yes.

2              THE COURT:  What authority have you got for that?

3              MR. REHN:  I don't have a case that I can cite for you

4    for that.

5              THE COURT:  I would say, generally, in my experience,

6    we do expect lawyers to cite cases.  We expect them to be

7    responding to legal arguments and to respond in kind with legal

8    arguments.

9              I have to say, I look at your submission, and I'm not

10   sure I even need you hear because you seem to be relying just

11   on what was submitted ten years ago.  I'm happy to hear what

12   you say, but you've had a week to respond to the Federal

13   Defenders' submission.

14             So you're relying on the general notion of forfeiture

15   with respect to whether they get to even challenge the

16   guidelines calculation, even though it's a new PSR.

17             What about the other arguments raised by Mr. Arthus?

18             MR. REHN:  Sure.  On the substance, the application of

19   the murder cross-reference is based on the fact that the murder

20   was foreseeable to the defendant and it was within the scope of

21   his agreement to commit this armed robbery.  And a jury has

22   already found that.

23             And I think that certainly the legal basis for Count

24   Three has now been undermined by a subsequent development on an

25   unrelated area.  But the jury's verdict is still controlling on

1     the factual issue of whether the defendant reasonably foresaw

2     the murder and whether the murder was within the scope of the

3     defendant's agreement.

4            I don't think the defense's characterization of the

5     Court's jury instructions at the trial is accurate.  The jury

6     was instructed with respect to Count Three that it could base

7     the conviction for murder of the defendant.

8            It's a substantive murder charge, Count Three.  And it

9     could be based either on the defendant's participation in the

10    conspiracy charged in Count One or in his participation in the

11    actual attempted robbery charged in Count Two.

12           As to the first, the Court instructed the jury on the

13    principles of conspiracy law, including that the act was

14    reasonably foreseeable to the defendant, and that's in the

15    context of the Count Three murder charge.

16           And I think the best way to read those charges is that

17    the jury had to find that the murder itself was reasonably

18    foreseeable to the defendant to convict the defendant on Count

19    Three.

20           Similarly, the Court instructed the jury on general

21    principles of aiding and abetting law with respect to basing

22    the Count Three murder conviction --

23           THE COURT:  Getting back to the conspiracy, you've

24    talked about foreseeability.  The main argument I think for

25    Mr. Arthus -- I'm not going to argue for him.  He'll get a

1      chance -- was whether or not this was within the scope.

2              He seems to be construing that very narrowly to mean

3      that there had to have been a contemplation of the murder.  I'm

4      not sure that that's accurate.  But I don't think you've

5      addressed, so far, whether or not what transpired was within

6      the scope of the agreement.

7              MR. REHN:  Yes.  Well, that was also part of the

8      Court's conspiracy instructions when it was talking about the

9      Count Three murder charge, the within-the-scope language.

10             And it is well established that a killing in the

11     course of an armed robbery is in the scope of an agreement to

12     commit an armed robbery.  The conspirators do not have to --

13             THE COURT:  When you say it's "well established," what

14     are you referring to?

15             MR. REHN:  Your Honor, I'm referring to the fact

16     that --

17             THE COURT:  Are there cases?

18             MR. REHN:  I don't have a particular case.

19             THE COURT:  Why do you not have cases?  I don't

20     understand that.  What did you think we were going to do today?

21             He's citing cases.  He's citing *Johnson*.  He's citing

22     other cases.

23             MR. REHN:  I'm happy to discuss *Johnson*.

24             THE COURT:  You just said it's "well established."

25             What authority am I taking?  Your vast experience --

1          MR. REHN:  It's based on --

2          THE COURT:  If I talk, you stop.  Understood?  It's

3  not that hard, it's not that complicated, and it's not a rule.

4          So are you telling me that it's well established based

5  on your experience or based on something else?

6          MR. REHN:  The primary thing I would point to in this

7  case is the jury instructions that the jury was given in which

8  the jury was instructed that it had to find that this murder

9  was within the scope of the conspiracy and was reasonably

10  foreseeable to the defendant in order to convict, basing the

11  murder charge on Count One, the conspiracy.

12          THE COURT:  I know what my instructions were.  I'm

13  asking you what you're referring to when you say that it's well

14  established that a murder that takes place in the course of a

15  robbery is within the scope of the robbery.

16          So what are you referring to?

17          MR. REHN:  The principle of --

18          THE COURT:  "principle."  I don't need your

19  editorializing on principles.  I need authority.

20          MR. REHN:  I don't take issue with the Court's legal

21  instructions.  I don't think anybody did because the legal rule

22  is that a murder that is within the scope of an agreement to

23  commit an armed robbery can be, as it was in this case, charged

24  and found by a jury to have been part of what the defendant

25  agreed to and reasonably could have foreseen was an outcome of

1    the armed robbery in which he participated.

2            That aligns with the language in the guidelines.  It

3    is the appropriate way to apply the guidelines in this case.

4            THE COURT:  When you say it "aligns with the

5    guidelines," what are you referring to?

6            MR. REHN:  The guidelines refer to a cross-reference

7    based on relevant conduct which includes --

8            THE COURT:  Chapter 1?

9            MR. REHN:  It's 1B1.3.

10           THE COURT:  This is cited in Mr. Arthus' letter;

11   correct?

12           MR. REHN:  That's correct.  The language is cited on

13   page of the defendant's letter.  It has the language in

14   subsection B there, the three elements:  Within the scope of

15   the jointly undertaken criminal activity, in furtherance of,

16   and reasonably foreseeable.

17           And those were the elements that the jury was

18   instructed with in relationship to whether it could find the

19   defendant guilty of murder based on his participation in a

20   conspiracy to commit Hobbs Act robbery.

21           Now, what the defense has tried to do is to say that

22   there's some daylight between the conspiracy law and this

23   language, notwithstanding that the language is essentially the

24   same.  And they primarily rely on this case of *United States v.*

25   *Johnson*.

1       But that case is clearly distinguishable because in

2   that case, the defendant was not convicted of a substantive

3   murder charge.  The defendant was committed of a conspiracy to

4   commit extortion.

5       So there had to be a separate factual basis for

6   finding that the murder was within the scope of the defendant's

7   agreement to the conspiracy to commit extortion.  The jury

8   hadn't been presented with that question.

9       Here, however, the jury was presented with that

10  question.  The jury resolved that question.  Even if the Court

11  were to conclude that, because on a separate legal issue the

12  Supreme Court has determined that Count Three is no longer

13  maintainable as a matter of law and therefore it does not need

14  to follow the jury's factual finding on that issue, the facts

15  at trial clearly supported that.

16      The defendant agreed to participate in an armed

17  robbery.  He understood that guns would be used to perpetrate

18  the robbery.  There is no question that they did not plan to

19  shoot the victims of the robbery.

20      But it was foreseeable that that was an outcome.

21  That's why the guns were brought to the robbery, because when

22  you're committing a robbery of a drug dealer, you understand

23  that there is a chance you may have to actually employ your

24  firearm and discharge your firearm in order to make the robbery

25  happen.

1          And that's exactly what foreseeably happened.  The

2     defendant agreed to participate as a lookout as part of that

3     armed robbery.  I think the jury's conclusion, the only

4     reasonable conclusion that can be based on this evidence, even

5     if the Court were not to feel bound by the jury's conclusion,

6     we would submit is binding as a matter of fact in this case.

7          THE COURT:  Why don't we stop there.

8          Mr. Arthus, why don't you pick up there.

9          Just for the folks here, Mr. Gonzalez and his

10    coconspirator and codefendant, were convicted of the use of a

11    firearm that resulted in the death of another individual.  That

12    count is a serious crime.

13         The Supreme Court has since directed that in cases

14    like this one where the underlying crime of violence was a

15    conspiracy or an attempt to commit a robbery, that that's not

16    sufficient to be a crime of violence under what's known as the,

17    "categorical approach," which requires that every conceivable

18    commission of the crime would involve the use of force or

19    violence.  So it's a very technical distinction that the

20    Supreme Court made.  But it has nonetheless resulted in Count

21    Three of the indictment being vacated.

22         But the jury did find, Mr. Arthus, that this was

23    within the scope; that it was in furtherance; and it was

24    foreseeable.

25         Would you agree with that?  That's what the

1    instructions reflected.  Correct?

2          MR. ARTHUS:  So my reading of the instructions is that

3    they were given two different possible grounds for conviction,

4    either aiding and abetting or the Pinkerton conspiracy grounds.

5    I'm not sure its possible to determine here whether or not they

6    actually convicted on the Pinkerton grounds or on the aiding

7    and abetting grounds to determine what their factual basis was.

8          THE COURT:  Assuming it were the Pinkerton, the

9    conspiracy grounds, that would be sufficient then for you?

10   That would end it?

11         MR. ARTHUS:  No.  I'm just addressing the fact of

12   whether or not it was necessarily on the conspiracy ground.  In

13   fact, I want to emphasize the government's theory in their

14   summation, which was that Mr. Gonzalez -- and this is a

15   quote -- "aided and abetted Reed's and Johnson's possession,

16   use, and carrying of those guns because he helped them in

17   carrying out the robbery."

18         So the government's position on aiding and abetting in

19   its summation was not aiding and abetting a murder.  It was

20   aiding and abetting an armed robbery.

21         THE COURT:  Actually, it was aiding and abetting the

22   possession of a firearm.  The underlying predicate was not an

23   aiding and abetting theory.  I don't think there was any

24   argument that the robbery was aiding and abetting.

25         Do you agree?

1          MR. ARTHUS:  What the government's position was was

2    that the aiding and abetting applied to the robbery count and

3    that the substantive crime that he was aiding and abetting was

4    possession of a firearm.  But the government never explicitly

5    argued in their summation that what he was aiding and abetting

6    was an actual murder to the extent of --

7          THE COURT:  Mr. Gonzalez was convicted of conspiracy

8    to commit robbery.

9          MR. ARTHUS:  Yes.

10         THE COURT:  This robbery.

11         MR. ARTHUS:  Yes.

12         THE COURT:  So the jury convicted him on that.

13         MR. ARTHUS:  Yes.  Absolutely.

14         THE COURT:  So the aiding and abetting, it seems to

15    me, related to the possession of the firearm because

16    Mr. Gonzalez didn't possess the firearm, but others did.

17         MR. ARTHUS:  Yes.  I agree with that.  It was the

18    aiding and abetting for Count Three.

19         THE COURT:  But the instruction with respect to 924(j)

20    was that the firearm was going to be within the scope of the

21    underlying offense, which was a conspiracy to commit the

22    robbery, and then in furtherance and also foreseeable.

23         MR. ARTHUS:  Yes.  We're not contesting that he aided

24    and abetted possession of the gun.  But for the murder

25    cross-reference to apply, what he has to aid and abet is the

1    actual commission of the murder, which under Rosemond would

2    require him to actually want or intend for the murder to take

3    place.

4              There is no question here that he aided and abetted

5    gun possession.  When we did our robbery guidelines

6    calculations, we conceded that he would be subject to the bump

7    up for aiding and abetting.

8              THE COURT:  So your theory is that somebody who agrees

9    to participate in a robbery, agrees that guns can be used, can

10   never be convicted or never can be sentenced under this

11   cross-reference, unless there was first a discussion in advance

12   about, we might have to kill somebody?

13             MR. ARTHUS:  No.  I think what this turns on -- and I

14   think this is a key point -- is the specific factual

15   circumstance of this case where the discussion of the robbery

16   that was put forward by Donnell Richardson was that this was a

17   robbery of unarmed individuals where no violence would be

18   necessary and where guns did not need to be used.

19             So that was Mr. Gonzalez's understanding of this

20   specific robbery, is that this was a robbery that although the

21   codefendants would be bringing guns, the understanding was that

22   the use of those guns would not be needed and that no violence

23   would be necessary.

24             And I think that puts this in a distinct factual

25   situation from other robberies that would fall under this

1  cross-reference where at least the contemplated use of -- the

2  use of weapons is at least contemplated.

3       THE COURT:  So your view is that a robbery that

4  contemplates that guns will not be needed, but nonetheless they

5  bring them and they end up being used, falls outside of this

6  cross-reference?

7       MR. ARTHUS:  In this situation, yes.  It would fall

8  outside of this cross-reference because it would not meet the

9  aiding and abetting prong because, under those circumstances,

10 Mr. Gonzalez would not have wanted the guns to be used and

11 murder to be committed.

12       And that would bring it outside the scope of prong of

13 the conspiracy law because it's now outside of the scope of the

14 agreement, which is a robbery where guns will not need to be

15 used.  So that's our position in terms of the jury instructions

16 and in terms of the applicability of the murder

17 cross-reference, of course which is discussed at much greater

18 length in the letter.  I'm happy to go into more of the

19 argument from the sentencing submission, but I know the Court

20 has reviewed them.

21       THE COURT:  I have.

22       Is there anything else you want to say in response to

23 Mr. Rehn's remarks?

24       MR. ARTHUS:  Does the Court want me to respond to the

25 forfeiture prong?

1            THE COURT:  Sure.

2            MR. ARTHUS:  No guidelines calculation was made at the

3    original sentencing about robbery, about the attempted robbery

4    and the conspiracy to commit robbery, in terms of applicability

5    of a cross-reference, so this issue, as it applies to the

6    attempted robbery and the conspiracy counts, this was never

7    discussed at the original sentencing.  So it couldn't be

8    forfeited because the original --

9            THE COURT:  It was level 43 before.  Right?

10           MR. ARTHUS:  Yes.  That was based on the 924(j).  But

11   the 924(j) is gone.  So defense counsel had no reason to

12   contest the applicability of any cross-references to the

13   robbery counts, which are now at issue, at the original

14   sentencing.  So we can't forfeit an issue that was never even

15   ripe at the initial sentencing.

16           THE COURT:  Mr. Rehn, do you want to respond?

17           MR. REHN:  Your Honor, on the point about whether it

18   could have been based on conspiracy or aiding and abetting,

19   again, the count is not just a use and carrying a firearms

20   counts.  It's the use and carrying a firearm causing the death

21   of a person count.  So that's an element of the offense that

22   the jury necessarily had to find.

23           Defense has purported has a snippet from the

24   government's summation.  But the overall proof at trial was

25   that the use and carrying of a firearm caused the death of a

1    person.  And that was within what was, with respect to the

2    conspiracy charge, what was reasonably foreseeable within the

3    scope of the agreement to commit the armed robbery.

4          And then the alternative grounds would have been

5    aiding and abetting in connection with Count Two, the

6    substantive attempted Hobbs Act robbery charge, but even there,

7    with respect to aiding and abetting, that's an even stronger

8    basis for finding that the jury necessarily found that the

9    defendant would have understood that a murder would be

10   committed because aiding and abetting requires that that

11   defendant intend that that be a potential result of their

12   action.

13         So, again, because the death itself is an element of

14   Count Three, you can't escape that by saying he was just aiding

15   and abetting the carrying of a firearm.  This is a case in

16   which the carrying of the firearms resulted in the death of a

17   person.

18         That was within the scope of the agreement.  It was

19   reasonably foreseeable that that could happen as a result of

20   this robbery, and the defendant aided and abetted that robbery

21   and participated in it as a lookout during the robbery.

22         So he was factually guilty of having committed murder,

23   notwithstanding that we subsequently don't recognize these two

24   counts as a predicate for the murder charge.  So we believe he

25   can't be convicted of that at this point.

1    But he's factually guilty.  The jury found that.  The

2    facts fully support that.  so it's appropriate, when we look at

3    the exact same language in the sentencing guidelines, to apply

4    the murder cross-reference here.

5    THE COURT:  Mr. Arthus, the last word.

6    MR. ARTHUS:  Your Honor, I just need to respond to the

7    concept that he was factual guilty of having committed murder.

8    That is not what this situation was.  He was factually guilty

9    of having committed or aiding and abetting gun possession

10    during which someone else committed murder.

11    Now, for a jury determination, that may be one

12    concept.  But the guidelines are clear that sentencing

13    liability is supposed to be at least somewhat tied to someone's

14    real conduct and that the scope -- and as we explained in our

15    letter, the scope of sentencing liability is narrower than the

16    scope of conspiracy law.

17    Here, there is no question.  I don't want it to seem

18    like I'm trying to minimize at all what happened here because

19    that is not the goal, and I just want to make that crystal

20    clear.

21    But the situation here is that the crime that he aided

22    and committed was Johnson's possession of a gun in which

23    Johnson killed someone else, and that is a unique factual

24    circumstance that does not fall within the sentencing

25    guidelines as presented.

1          I do want to make it clear that I'm not trying to

2    minimize at all.  This is, as the Court said, a technical legal

3    argument, but it is an important one because it brings it

4    outside of the murder cross-reference.

5          THE COURT:  I think that this is an interesting

6    question.  I'd say ultimately I'm persuaded that level 43 is

7    the proper place to be.  I think this case is very

8    distinguishable from Johnson.

9          The facts in that case involve an extortion that took

10   place over a long period of time and in a location where the

11   defendant in question wasn't even present.  This is one that

12   took place in one location.  Mr. Gonzalez was there, understood

13   guns were going to be used.  Certainly the hope was that they

14   wouldn't have to use them, but the other coconspirators

15   wouldn't go forward without the gun.  The testimony was clear

16   about that.

17         The jury was instructed about the scope of the robbery

18   conspiracy.  They were instructed on whether or not the

19   shooting was in furtherance of and foreseeable in connection

20   with that shooting.  I think clearly the jury's verdict

21   reflects that they were persuaded.  I was certainly persuaded.

22         So on the basis of that, I am prepared to find that

23   the cross-reference does apply and that 43 is the base offense

24   level.

25         I will say -- I think this is an interesting and

1    somewhat technical argument.  I don't know that it ultimately

2    matters that much.  The facts are what they are.  The role that

3    Mr. Gonzalez played I think was very clear.

4         How it fits within the technical parameters of the

5    guidelines, how it fits within the technical parameters of

6    924(j) and the statutes is interesting but ultimately is not

7    dispositive.

8         So I sentenced Mr. Gonzalez below the guidelines in

9    light of his actual role, which I thought made him less

10   culpable than Mr. Johnson, who did the shooting, or Mr. Reed

11   who insisted on bringing two guns to the robbery.  But

12   nonetheless, I do think this guideline is appropriate.

13        But even if it were not, my sentence would be and will

14   be unaffected by that because I'm really focused on the actual

15   facts and what went on here and not categorical approaches and

16   not the hypotheticals that could be spun to fit the language of

17   the guideline or the language of the felony murder statute at

18   Section 1111 as referenced in the guidelines.

19        So that's my finding with respect to offense level.

20   So that puts us at level 43.

21        The criminal history category is category VI.

22        I don't think there are any dispute on that, is there,

23   Mr. Arthus?

24             MR. ARTHUS:  No.

25             THE COURT:  So it's a lengthy criminal history.  It

1    goes back a long way beginning when Mr. Gonzalez was a

2    teenager.  We'll talk more about the circumstances of his youth

3    in a moment, because those are relevant things to consider.

4         But certainly most of the criminal history that drives

5    him being in a criminal history category VI is more recent than

6    when he was a teenager.  He has multiple prior felonies,

7    including multiple prior federal felonies.  And he also

8    committed this offense while he was on supervised release.  So

9    I think criminal history category VI almost doesn't capture the

10   criminal history of Mr. Gonzalez.  But nonetheless, that's

11   where he is.

12        So based on a category of VI and an offense level of

13   43, the guidelines would call for a sentence of life.  That's

14   what I found last time.

15        But there are other factors that have to be

16   considered.  I mentioned this a minute ago, and I'll just

17   remind Mr. Gonzalez and explain to those who are here today who

18   maybe weren't here the last time, in addition to the sentencing

19   guidelines, which are purely advisory -- I don't have to follow

20   these -- there are other factors I have to consider.

21        Those factors include the facts and circumstances of

22   the offense.  The guidelines talk about that a little bit.  But

23   I have to look really at what actually happened here, what role

24   Mr. Gonzalez played, what role the other coconspirators played,

25   what was their motivation.  I have to look carefully and make

1    sure that the sentence fits the crime.

2           I also have to look at the facts and circumstances of

3    the life of Mr. Gonzalez.  Mr. Gonzalez is a unique individual.

4    He's different than anybody I've ever sentenced or will

5    sentence.

6           It's unusual that I'm sentencing someone again ten

7    years later.  It's kind of the quirk of the Supreme Court

8    cases.  But I think it's fair to say that Mr. Gonzalez is not

9    the same person today that he was ten years ago either.

10          People are not static.  People are complicated.

11   People change.  People move in directions, and they don't

12   always move in the same direction.  They sometimes move

13   positively in some ways and negatively in other ways.

14          But I have to consider the whole history, the whole

15   person.  I have to do what I can to understand the whole person

16   and to make sure that the sentence is tailored to that person.

17          I have to also consider the need for this sentence to

18   promote respect for the law and and for this sentence hopefully

19   to deter and discourage criminal conduct like this in the

20   future.

21          The hope is that the sentence that I impose will send

22   a message that others might learn of and consider.  That's hard

23   to know.  It's hard to know who will be aware of this sentence

24   and who will even think about it later.

25          But the hope is that somebody will maybe think twice

before robbing a group of drug dealers or bringing a gun to
that robbery.  That's the hope.  And the hope also is that
Mr. Gonzalez himself will, as a result of this sentence, never
again engage in this kind of criminal conduct, even though he
previously was sentenced multiple times and still returned to
criminal conduct.  So I have to figure out what is the right
sentence is to send that message to him.

I also have to consider Mr. Gonzalez's needs while
he's in custody.  And those needs change over time.  Some
people have physical and medical needs, health needs that have
to be addressed.  Some have mental health and substance abuse
treatment needs.

Some have the need just for an education or job
training or things that will enable them, when they get out, to
be productive and so that they don't ever slip back into
addiction or slip back into criminality as a way to make a
living.

So those are things that I have to take seriously and
I will take seriously.  So I guess the point is there are lots
of different factors that a judge has to weigh and balance and
evaluate.  No two cases are exactly alike.  Every case is
unique because it's a unique individual, and the facts of a
case are unique, even though it might involve the same crime.

So the balancing is what the judge is charged with
doing.  It's a hard thing to do.  But it's something that I

1    certainly take seriously and most judges I know take very, very

2    seriously.

3         Mr. Gonzalez, we were here a decade ago.  We talked

4    about these things.  But there are some changed circumstances

5    since then.  So Mr. Arthus discusses those quite a bit in his

6    sentencing submission.  I want to hear more about that.  I also

7    want to discuss some of the things that I've learned that I'm

8    not sure if the parties are aware of this or want to be heard

9    on it.

10         The letter that you wrote, Mr. Arthus, talks about the

11   work details that Mr. Gonzalez has been on.  It talks about his

12   infractions while he's been in custody.  It talks about his

13   education, the programs he's participated in for education.

14         You channel the sentencing reduction that took place

15   before Judge Broderick which took place several years ago.  It

16   seems like there were some more recent infractions that you

17   didn't mention.  I have a 2019 infraction.

18         Are you aware of that one?

19         MR. ARTHUS:  Yes.  That was considered.

20         THE COURT:  That's possession of a dangerous weapon in

21   2019.  And then there is an August of 2019 which was insolence

22   to the staff and unsanitary living space.  In 2017, there was

23   also possession of a weapon, which was denied, but he was

24   nonetheless found liable for it.

25         And then there are additional infractions going back

1    to 2013 and 2012, which there were three that I'm aware of.

2    Three in 2013 and '12 and then one in 2011 which was accepting

3    money without authorization.

4         So the latter, the 2019s, seem more serious to me.

5    I'm not sure why they would be worth dismissing.  I thought

6    your letter really was just focused on the 2013 ones.

7         MR. ARTHUS:  I can just address that.  That was

8    Judge Broderick's decision was in '21, if I remember right.  It

9    was post those.  That was why his reference had been that there

10   were only three infractions in the last seven years at that

11   time, now a little over nine years, and that there had been no

12   infractions in the prior now 3 1/2 years.  So those were

13   considered by Judge Broderick.

14        THE COURT:  The other thing I notice is that

15   Mr. Gonzalez has certainly -- he's been working pretty

16   consistently at various facilities where he's been assigned as

17   an orderly and other things.  He's not working now where he's

18   been since October, but that might be excusable.  It's the MDC

19   in Brooklyn.  That's kind of a temporary thing.

20        In terms of his treatment, his participation in

21   educational programs and educational courses, it appears that

22   most of it, virtually all of it, is really from December 2019

23   until 2021.

24        In other words, it all postdates *Davis*.  It all

25   postdates the prospect of potentially having the 924(j)

1    removed.  He's been in prison for over a decade but didn't

2    really start taking any -- he took one program in 2017 for a

3    couple months.  But otherwise, nothing starts until the very

4    end of 2019.  So that was curious to me.  I just want to make

5    sure I'm not missing something in terms of dates.

6              MR. ARTHUS:  No, but I can address that very briefly.

7    That also postdates when he was transferred out of Big Sandy

8    and over to Victorville and then to Canaan.  That was a large

9    hindrance to his ability to participate in programs.

10             There is limited programming offered at Big Sandy.  It

11   often locks down because of huge securities concerns at that

12   facility.  But he was enrolled, I believe, in the GED while he

13   was at Big Sandy, if I'm remembering earlier.  So that's

14   something he started earlier.  But that post 2019, that's also

15   when he was transferred out of Big Sandy.

16             THE COURT:  Are you saying that Big Sandy does not

17   have educational programs?

18             MR. ARTHUS:  No.  What I'm saying is that because of

19   the constant violent conduct that occurs there, those programs

20   were repeatedly locking down during his time there.

21             THE COURT:  But if he had enrolled, it would show.  He

22   didn't enroll.  It's not that he didn't finish.  He didn't

23   enroll.

24             MR. ARTHUS:  I get the point, your Honor.  I'm

25   discussing this now.  We had requested his records from the BOP

1  system from several months ago, back in September, and still to

2  this date have not received them.  So I've been working off of

3  just a reentry plan.

4          THE COURT:  I can order them.

5          MR. ARTHUS:  Yes.  I am just saying that I am

6  answering these questions, but I am working off of a reentry

7  plan.  So the Court should just be aware of that.

8          THE COURT:  Do you want an adjournment to get access

9  to those materials.

10          MR. ARTHUS:  No.  I think I can reference now the

11  changes and the growth and the rehabilitation.

12          THE COURT:  I don't want to hamstring you.  You can

13  talk about anything you want.  Your letter didn't talk about

14  some of the things I mentioned.  So they were on my mind.

15          MR. ARTHUS:  That is partially a result of limited

16  records and partially because that was information that

17  Judge Broderick had had.  So I was able to at least rely on

18  Judge Broderick's findings with regard to Alcoholics Anonymous

19  education courses, and GED courses, and efforts at

20  rehabilitation.  So those were things that were before

21  Judge Broderick at the first resentencing that happened.

22          THE COURT:  So the floor is yours.  I'm happy to hear

23  from you.

24          MR. ARTHUS:  So we're asking for a sentence of 110

25  months which we believe is sufficient but not greater than

1   necessary in this case.  As the Court acknowledged -- I'll just

2   point out again he has a huge support, family support,

3   contingent here.

4           And I bring that up not just to show the family

5   support that he has but because one of the things that the

6   Court had emphasized at Mr. Gonzalez's initial sentencing was

7   that he should work to maintain relationships with his family,

8   in particular, with his daughters.

9           One of his daughters is actually here today.  She

10  wrote a letter on his behalf.  So that is something that he

11  did.  He has maintained that family support.  So I did want to

12  emphasize that.

13          In terms of Mr. Gonzalez's history and

14  characteristics -- and I'm not undermining what prior defense

15  counsel did and submitted, but we were able to get much more

16  information about Mr. Gonzalez's background, in particular, the

17  learning deficits and disabilities and issues that he went

18  through in his schooling and upbringing that were not

19  originally before the Court.

20          Mr. Gonzalez's parents, as the Court is aware, were

21  crack and heroin addicts.  It appears that he was likely born

22  with drugs in his system that contributed to the learning

23  disabilities that he subsequently suffered from.

24          His father used to beat his mother in front of him.

25  When his father was gone, his mother used to beat him.  He was

1    shuttled between homes.  He lived in extreme poverty living

2    often resulting in him living on the streets.

3            And I think it's important to emphasize that school a

4    lot of times is a way that people get out of these situations.

5    But for Mr. Gonzalez, who suffered from learning disabilities,

6    school was not going to be the answer.  His IQ was, at one

7    point, measured in the 60s, typically in the 70s.

8            He had psychological evaluations that showed severe

9    learning disabilities.  At nine years old, he could barely

10    read.  One of the reports actually says, this is a

11    nine-year-old boy who cannot read.

12            At 14 years old, he had a developmental age of six.

13    All along, he was suffering from untreated dyslexia that the

14    school had failed to recognize, doctors had failed to

15    recognize, and that was contributing to what was going on.

16            The school system, as you see in the records, was

17    unbelievably slow in finding proper placements for him.  It was

18    not entirely the school's part.  Part of it was that his mother

19    had stopped responding to letters and phone calls from the

20    school seeking for him to get proper placement.

21            It took years for him to get even basic services.  And

22    by the time that intensive services had come about, he had

23    basically been just living on the streets at that point.  This

24    is someone who, as a child, would constantly missed school.

25            He would show up unkept, unfed, and in pain and

1    terrified that his mother was about to abandon him.  As a

2    teenager then, he was the victim of multiple shootings, one of

3    which left him paralyzed for a long time.  Around the same

4    time, his mother died.

5         And he was sent to live with his grandmother where he

6    was physically beaten and tortured by aunts and uncles,

7    including being whipped with an extension cord while his

8    grandmother did nothing to stop it.

9         So from all that, unfortunately, the outcome was that

10   he fell into drug use, the same demon that followed his

11   parents.  He fell into drug use.  He became homeless.  He began

12   living on the streets.  He didn't even have shoes, and he

13   stopped going to school.

14        I don't offer this as obviously an excuse.  I'm not

15   trying to excuse what happened here.  Mr. Gonzalez certainly

16   has never tried to excuse what happened here.  It is at least a

17   little bit of an explanation of how he fell into drug use.

18        In particular, I would point to the psychological

19   evaluations that showed that when he was young, this was

20   someone who had hammered into him, in the psychologist's

21   opinion, distrust, anxiety, anger, and fear of others.

22        And drugs turned out to be an easy escape.  The Court

23   referenced his criminal record which is substantial.  And a lot

24   of those crimes were drug related and were fed by that drug

25   activity.

1        Since the sentencing here, he has made substantial, we

2   would say substantial, efforts at rehabilitation.  And I think

3   it's important to note that he was sentenced consecutive to

4   another case.

5        And we had no reason to think he was going to get out

6   of prison before he was in his 70s.  He was sent to Big Sandy

7   initially for the first decade of his imprisonment.  That was a

8   very violent institution.  While he was there, he was actually

9   stabbed in the head and the face.

10       My understanding is that that final disciplinary

11  infraction the Court referenced, the possession of a weapon,

12  was shortly after or about the same time he had been stabbed in

13  the head, which gives some context to that disciplinary

14  infraction.

15       He took GED courses.  He took educational courses.

16  We've gone through the steps he's taken while he's been in

17  prison.

18       THE COURT:  What about the timing of it?  Mr. Gonzalez

19  said and you said in your letter that he took some of the

20  things we discussed at sentencing to heart.  And that seems

21  true with respect to maintaining relationships with his family.

22       One of the things that he was also talking about doing

23  was getting a GED and taking advantage of programs.  That

24  hasn't happened.  And the programs all seem to have been very

25  late-breaking.

1          They're really after the prospect of a sentencing

2   before Judge Broderick and after the prospect of a resentencing

3   under *Davis* and those cases.  A cynic might suggest that that's

4   really the motivation.  It's not something that predated the

5   prospect of preparing a narrative for sentencing.

6          MR. ARTHUS:  Yes.  Our understanding of the situation

7   is that it was very difficult getting into that programming at

8   Big Sandy and that he was -- as an individual who had a very

9   far off release date, a lot of this programming, particularly

10  drug programming, is keyed to someone's release date.

11         And people are not often able to get into those

12  programs until their release date approaches.  But he made

13  efforts to get in any way.  And particularly, even after 2019

14  when programs were locking down during COVID under the

15  conditions that he was going through, he still managed to

16  participate in those programs and still managed to take steps.

17         And his family spoke at length in their letters, or

18  spoke in their letters, about how he's had a changed outlook in

19  recent years.  Sometimes people don't just, as the Court is

20  aware, change immediately.  Sometimes it talks time and

21  experience.

22         Here, in this situation, I think that's what we're

23  seeing with Mr. Gonzalez.  Particularly when you look at the

24  conditions that he's been incarcerated under, those are not

25  conditions that were contemplated by the guidelines, by

1    3553(a), or that the Court could possibly have been aware of

2    back when the sentencing occurred.

3            Not just the violence at Big Sandy but also the COVID

4    conditions that he endured, those go beyond normal prison time.

5    That's particularly hard time.  During that time, he still

6    participated in programming and took steps towards

7    rehabilitation.

8            I do want to emphasize -- and obviously the Court is

9    not bound by what Judge Broderick said, but Judge Broderick did

10   indicate that he believed that efforts at rehabilitation had

11   taken place.  So I do just want to emphasize that again.

12           I think something else that has happened here is that

13   Mr. Gonzalez has shown serious remorse and regret about this

14   incident.  He submitted a letter to the Court.  He didn't speak

15   at the first sentencing on his attorney's advice.

16           I'm not even going to try to summarize that letter

17   because I think he said it best.  And I know the Court has

18   reviewed it.  I don't want to trample on his words.  But this

19   is someone who does feel serious regret about what has happened

20   here.

21           The Court recognized at the initial sentencing that

22   Mr. Gonzalez was the least culpable of the three individuals.

23           THE COURT:  That was true when I sentenced him the

24   first time.

25           MR. ARTHUS:  Yes.

1        THE COURT:  It seems to me that the only things that

2   have changed are sort of relative to what Mr. Gonzalez has been

3   doing in the interim.  It seems to me that the nature of the

4   offense obviously hasn't changed.  The need to deter, the need

5   to promote respect for the law, all the other things under the

6   3553(a) factors, seem to be basically constant.  Nothing has

7   changed for those.  Right?

8        MR. ARTHUS:  The reason I brought that up was to say

9   that when he is expressing remorse, I don't think there was

10  ever a question in the trial transcript that he did not want

11  this to happen, for what that's worth.  And I think that is

12  consistent with the remorse he's shown.

13       THE COURT:  I think it was pretty clear.  I recall

14  there was trial testimony that he didn't want this to happen.

15  He had said as much to one of the witnesses; that he was

16  surprised and disappointed and frustrated that Johnson and Reed

17  went in guns blazing; that he didn't want that to happen.  I

18  think that was true when I sentenced him the first time.

19       The expressions of remorse that are now in his letter,

20  that wasn't explicitly made the last time, but I had no reason

21  to think that he was remorseless.  I didn't assume him to be

22  happy that it happened.

23       MR. ARTHUS:  One other thing that has changed that I

24  do need to note here is that Reed is going to be resentenced

25  too, and Reed received a life sentence, which now is certainly

1    going to be lower.  He's no longer eligible for a life sentence

2    now that the 924(j) count is gone.  So our position is, in

3    terms of unwarranted sentencing disparities, if there's a

4    reduction in Reed's sentence --

5              THE COURT:  Reed's top sentence would be 40 now.

6              MR. ARTHUS:  40 would be the top.  If I remember

7    right, I believe he's requesting 20 and the government's

8    requesting 40 in that case.

9              So if Reed's sentence is reduced at the very least,

10   Mr. Gonzalez's sentence should be reduced too.  Particularly

11   that the top count is now gone, he's no longer a career

12   offender.  And he's actually served concurrent time.

13             He actually only has about 3 1/2 years of credit in on

14   this case.  So in terms of the recidivism risk, even a

15   110-month sentence pulls him into basically his 50's, which

16   puts him at a decreased risk for recidivism.

17             But I would just conclude here by pointing out I think

18   the most telling fact about Mr. Gonzalez here is that he is not

19   requesting to be released today.  In fact, he told me not to

20   make a time-served request or something to that because he is

21   someone who recognizes the gravity of the conduct he

22   participated in, because he is someone who has serious regret

23   and remorse.

24             And it's the situation.  As the Court indicated,

25   sometimes people learn from their mistakes.  Sometimes,

1    unfortunately, it takes someone's worst mistakes to lead them

2    to growth.  So under the circumstances, we would say that a

3    110-month sentence is sufficient but not greater than necessary

4    in this case.

5         THE COURT:  What that really means is 110 months with

6    credit for the time that he's already served that he's gotten

7    credit for.  Right?

8         MR. ARTHUS:  On this case.  The other sentence has

9    ended already.

10         THE COURT:  Right.  So the 110 months would really

11    be more like 70.

12         MR. ARTHUS:  I believe it's a little bit more than

13    seven more years at this point, which, considering he's been in

14    since 2010 on these cases, it's still a pretty hefty prison

15    term, all things considered.

16         THE COURT:  Thank you, Mr. Arthus.

17         Let's hear from the government.  I'll give you a

18    chance to respond if you'd like.  Mr. Rehn.

19         MR. REHN:  Yes, your Honor, just briefly.  I think the

20    Court correctly identified that the really relevant

21    considerations for this resentencing are what, it if anything,

22    has changed since the initial sentencing that would be relevant

23    to a different result here.

24         I think there are a couple of reasons why the

25    arguments that the defense makes for such a drastic reduction

1   in the defendant's sentence are unwarranted.  The first is, as

2   I think the Court has already noted, what the defendant has

3   done in the interim is not as one-sided as the defense has

4   presented to you.

5       There has also been some significant disciplinary

6   infractions while the defendant has been in custody which I

7   think warrant consideration on the opposite side of the ledger

8   relative to his rehabilitative efforts.

9       And then secondly, with respect to his rehabilitative

10  efforts, I think it's important to recognize that

11  Judge Broderick did already take those into account in reducing

12  his sentence by five years.  So the defendant has actually

13  received some credit for that.

14      I think if you look back at the transcript from the

15  Court's initial sentencing, it was in the Court's mind that the

16  defendant would be in prison not just for the 30 years for

17  which he was sentenced but on top of the then existing 15-year

18  sentence for a total term of 45 years.

19      THE COURT:  The real driver of that is not

20  Judge Broderick.  It's that there were amendments to the

21  guidelines.

22      MR. REHN:  That's correct, your Honor.  But

23  Judge Broderick did take into account the rehabilitative

24  efforts as we've heard from defense counsel.  And that was one

25  of the reasons why he chose to reduce the sentence in the way

1    that he did.

2          THE COURT:  He sentenced below the guidelines both

3    times.  Right?

4          MR. REHN:  I believe that's right.  Yes, your Honor.

5    And likewise, the Court here sentenced the defendant to the

6    below-guideline sentence, and the Court did that contemplating

7    that the defendant would have the opportunity to get out of

8    prison at some point in the future.

9          It's certainly heartening that at least in the last

10   couple of years, the defendant has taken advantage of some

11   rehabilitative opportunities in prison, but that's exactly what

12   the Court was hoping would happen under the sentence that the

13   Court deemed was appropriate at the time.

14         This isn't a case where there is some exceptional

15   change in circumstances that would warrant a departure from

16   what was appropriate at the time.  It's certainly to be hoped

17   for that the defendant continues his rehabilitative efforts.

18         Under the sentence the Court originally imposed, he

19   still will expect to get out of prison in the future.  those

20   rehabilitative efforts are calculated for that.  But they're in

21   line with what the Court was hoping would happen when it

22   imposed its original sentence.  It's not some unexpected

23   development that would warrant a different result here we would

24   submit.

25         So ultimately, when you calculate all of the factors

1   that were in the Court's mind as of the time of the initial

2   sentencing in determining that a 30-year sentence was

3   appropriate and, in particular, the seriousness of the criminal

4   conduct and the extreme seriousness of the defendant's criminal

5   history, the way in which the defendant has behaved in prison

6   is not a sufficient enough factor, in the government's view, to

7   warrant a departure from the Court's initial sentence.

8          THE COURT:  I don't think you addressed the disparity

9   argument that Mr. Arthus has made.

10         MR. REHN:  Yes, your Honor.  The government has taken

11  a position that Mr. Reed should be resentenced to a sentence of

12  40 years.  So Mr. Gonzalez would still receive a lower sentence

13  than Mr. Reed did.

14         THE COURT:  It would be relatively less.  Mr. Reed was

15  given a life sentence.  Mr. Johnson was given a 40-year

16  sentence.

17         MR. REHN:  That's correct, your Honor.  That sentence

18  would still be available to Mr. Johnson.

19         THE COURT:  It's not clear what's going to happen to

20  Mr. Johnson because he's still --

21         MR. REHN:  But in the event that he were to prevail on

22  his application for resentencing, the Court's original sentence

23  would be available to him.

24         I think that a sentence that's consistent with the

25  Court's original sentence here would still preserve the Court's

1    recognition of this defendant's reduced role relative to his

2    codefendants.  And I think the happenstance that another

3    codefendant's potential maximum sentence has been reduced

4    shouldn't change the result in this case.

5         THE COURT:  All right.  Thank you.

6         Mr. Arthus, is there anything you would like to say in

7    response?

8         MR. ARTHUS:  I would just like a second to speak to

9    Mr. Gonzalez briefly.

10        THE COURT:  Okay.

11        (Defendant and counsel conferred)

12        MR. ARTHUS:  The only final thing I would add -- this

13   isn't based on my conversation with Mr. Gonzalez -- but that I

14   forgot to address was that the sentence in place right now on

15   the robbery count is 20 years concurrent.  So effectively, the

16   government's request is that those sentences be increased to

17   run consecutive.  The government's position had been that the

18   Supreme Court -- I believe they worded it was expected or

19   predict that people would receive higher sentences.

20        THE COURT:  It was "contemplated."

21        MR. ARTHUS:  It was contemplated as a possibility.

22   But I don't think that these circumstances warrant increasing

23   the sentence in that respect by running them consecutively.

24   But other than that, I would rest on our sentencing submission.

25        THE COURT:  All right.  Thank you.

1              Do you want to respond to that, Mr. Rehn?

2              MR. REHN:  It's addressed that in our written

3    submission.  The issue is that the Supreme Court contemplated

4    that people would not receive lighter sentences in many of

5    these cases.  And certainly this is a case that I think fits

6    within what the Supreme Court expected.

7              THE COURT:  It's hard to know what the Supreme Court

8    had in mind exactly.  But the reality is a lot of people have

9    gotten huge windfalls as a result of their decision related to

10   the categorical approach.

11             This is a situation where there is flexibility; that

12   courts that do believe the that originally imposed sentence is

13   still appropriate, can structure it differently to get to the

14   same place.  I don't think there is any question that I have

15   that discretion.  Ultimately, that's something I'm prepared to

16   do.

17             The last time I imposed sentence, I wasn't rigidly

18   following the guidelines.  I think I explained the nuanced

19   approach that was being taken with respect to all of the

20   conduct and all of the other factors under 3553(a).  So I think

21   there's no dispute about what discretion I have and what

22   authority I have.  Whether I exercise it is up to me obviously.

23             So, Mr. Gonzalez, you wrote me a letter.  It was a

24   very thoughtful letter.  Thank you for that.  You have a right

25   to address the Court now if you'd like.  You're not required

1    to.  But you certainly have a right to.  If that's something

2    you'd like to do, certainly I'm happy to hear from you.

3           THE DEFENDANT:  Yes.  I want to do it, but very short

4    because I stutter a lot, and I don't want to get caught up in

5    my words.  I want to say I apologize to the victim's family.  I

6    apologize to my family.  I know I committed a crime.  I'm here

7    today asking for leniency to give me another chance in society

8    so I can be productive for my family.

9           THE COURT:  Thank you.

10          THE DEFENDANT:  You're welcome.

11          THE COURT:  We've been at this for over an hour.  What

12   I'd like to do, if it's okay with everybody, is take a short

13   break so I can collect my thoughts.  I can reflect on what I've

14   heard from Mr. Gonzalez, from the lawyers.

15          I can then just also reconsider some of the things

16   that I had in my mind when I walked in here, but I always want

17   to make sure that I'm open to learning new information that

18   might be relevant to a sentence.  So ten minutes tops.

19          Then we'll come in.  At that point, then I will

20   announce the sentence that I intend to impose.  I will explain

21   my reasons for it.  I will then check with the lawyers to make

22   sure there is nothing illegal or improper in that sentence.  If

23   not, then I will formally impose the sentence.  So I don't

24   think it will take too much longer, but I think a ten-minute

25   break would be appropriate.  So thank you.

1          (Recess)

2          THE COURT:  Have a seat.  Thank you.

3          Let me state the sentence that I intend to impose and

4    explain my reasons for it.

5          Mr. Gonzalez, I mentioned all of the factors that I

6    have to consider.  Most of those factors are unchanged from

7    where they are a decade ago.  The fact is that a young man was

8    killed.

9          The fact is that you were engaged in a robbery

10   conspiracy that caused that; that you were also involved in

11   other criminal activity that led to this sentence being

12   consecutive to a then 15-year sentence imposed in another case;

13   that your criminal history was very, very lengthy then.  None

14   of that has changed.  That's all still true.

15         Your role in that offense was less than Reed's, and it

16   was less than Johnson's in the sense that you didn't carry

17   guns.  You didn't fire the guns.  Nonetheless, you were in on

18   the deal.

19         I think, in some ways, Mr. Arthus' submission, though

20   excellent, does I think understate your role.  You were at the

21   planning meetings.  You knew what was going on.  You were

22   there.  You were in.

23         I'm not saying that you wanted somebody to get killed,

24   but you certainly helped set in motion a series of events that

25   did result in someone getting killed, a really young man.  Who

 1    knows what he might have been.

 2            His family is not here, but his family is also never

 3    able to see him, even from a distance, even through letters or

 4    phone calls.  So he's been taken from them.  Who knows what he

 5    might have become in time.

 6            So the seriousness of the crime, the length of the

 7    criminal history, the nature of the offense and your role in

 8    it, I think all of that remains the same.  What has changed is

 9    you.  You've changed.  We all change.  Nobody is static, as I

10    said.

11            In your case, I think there have been some positive

12    developments.  I think it's good that you've been working at

13    the facilities that you've been in.  I think it's good that

14    you've maintained relationships with your family, including

15    your daughter who wrote a very thoughtful letter.

16            That's all good.  It carries its own benefits.  There

17    are things that come from doing that that are obviously

18    beneficial in their own right.  But still, it speaks well of

19    you that you have maintained relationships and that you have

20    worked while you've been in custody.

21            You have also taken some recent steps to get some

22    skills and to get some education.  Most of it is pretty recent.

23    And I think this case that is distinguishable from one of the

24    cases that Mr. Arthus talked about.  I Shea Douglas was a guy I

25    sentenced to time served after he was being resentenced in

1    light of a resentencing much like this one.

2        He wasn't serving as long a sentence.  But he in the

3    meantime, had gotten his GED and taken some college courses and

4    really turned his life around in a very profound way.

5        You've done some very positive things.  I don't mean

6    to minimize it.  But I think that yours don't compare with

7    Mr. Douglas', and yours are mostly pretty recent.  The programs

8    you're participating in are pretty short -- ten hours here, ten

9    hours there, two hours, two hours, four hours.  when you were

10   at Ray Brook back in 2004, you were part of a GED program that

11   had you commit over a thousand hours from what I've seen.

12       So there are different levels of commitment.  What

13   you've done so far is a step in the right direction, and I want

14   to give you credit for it because I think it's important.

15       So the question for me is what is appropriate.  What

16   is the appropriate sentence.  The government has urged me to

17   impose the same sentence to send the same message.  I get that.

18   I understand that.

19       I don't think I want to do anything to suggest that

20   this was not a serious crime or that it's not as relevant today

21   as it was ten years ago.  A young man was killed in a violent

22   crime that took place in an apartment building in Hunts Point,

23   a poor area of poor people just trying to do their best, just

24   trying to raise their family, go to school, go to work.  This

25   took place in broad daylight in the lobby of a building where

1    lots of people lived.

2          You were the lookout when these other guys went

3    charging in there with guns.  Who knows what could have

4    happened, what might have happened, involving not just the

5    targets, but innocent bystanders, kids.  So it was a brazen,

6    brazen crime.  And it wasn't your first rodeo.  You'd been

7    previously convicted of very serious crimes.

8          So I think my sentence here is not going to be

9    drastically different from what it was last time.  But I think

10   I have to do something that gives you credit and encourages you

11   to keep doing what you're doing.  So what is the right

12   sentence.

13         I'm prepared, in light of the positive things you've

14   done, minus some of the negative things -- you've got some

15   infractions that are not great, an infraction involving a

16   weapon, an infraction involving other things that had you lose

17   good-time credit or get put in the special housing unit.  I

18   know it's tough to be in prison.  I know there are some things

19   that are beyond your control, but you've had more infractions

20   than some that I sentence on resentencings.

21         So ultimately at the end of the day, I'm prepared to

22   come down four years.  That's four years of your life that

23   you're going to get back.  Coupled with the five years that

24   Judge Broderick gave you back, that's a nine-year reduction

25   from where you were a decade ago.

1          It's still a long sentence, but it's one that I think
2     is warranted in light of the seriousness of the crime, the
3     seriousness of the criminal history, and all of the other
4     factors that I mentioned.
5          There is also a term of supervised release that I'm
6     going to impose.  That will be three years to run concurrent to
7     both counts.  That will have conditions that I'll recite in a
8     minute.  They won't be terribly different from what they were
9     the last time.
10          Let me just check with the lawyers.
11          Does the government know of any legal impediment to my
12     imposing that sentence?
13          MR. REHN:  No.
14          THE COURT:  Mr. Arthus?
15          MR. ARTHUS:  No.
16          THE COURT:  Let me ask you to please rise,
17     Mr. Gonzalez.
18          Mr. Gonzalez, having presided over the trial in which
19     the jury found you guilty of the two counts that still remain,
20     I sentence you to a term of imprisonment of 26 years.  That is
21     basically consecutive to Judge Broderick's sentence, but you'll
22     get credit now for the time that you've already earned on this
23     sentence.  So I guess I'll have to do the math on that.
24          Mr. Arthus, do you have any recommendations as to how
25     to do that?  There is no consecutive to do at this point.

```
 1   Right?

 2           MR. ARTHUS:  Yes.  There is no consecutive.  The other

 3   sentence is completed at this point.

 4           THE COURT:  So I guess it will be 26, minus the time

 5   he's already served, gotten credit for, on this sentence.

 6   Right?

 7           MR. ARTHUS:  Yes.

 8           THE COURT:  So that is the sentence.  I'll do the math

 9   in terms of months.

10           Do you know what, in term of months, that he's been

11   given credit for?

12           MR. ARTHUS:  Not exactly.  It's approximately 3 1/3

13   years.  It may be actually slightly more than that.

14           THE COURT:  You can send me something.  I can check

15   with probation and the Bureau of Prisons.  But I'll hold off on

16   docketing the final judgment until I've heard from you.

17           MR. ARTHUS:  I'll reach out to BOP.

18           THE COURT:  Because that will matter.  So that's the

19   sentence.  It's to run concurrent on both counts, to be

20   followed then by a term of supervised release of three years,

21   also to run concurrent on both counts.

22           That term of supervised release will have conditions,

23   as you know, similar to what I imposed last time.  Those

24   conditions include some mandatory conditions, that you not

25   commit another federal, state, or local crime.
```

1          That you not use or possess a firearm or narcotics of

2     any kind.

3          There are standard conditions.  Those will include --

4     there are 12 of those in all.  I'm going to impose all 12.

5     They're in the presentence report.  I won't repeat them unless

6     you want me to.

7          There are some special conditions that I'll recite now

8     on the record.  They include that you'll participate in an

9     outpatient drug treatment program approved by the probation

10    office will include testing to determine whether you've used

11    any kind of drugs or alcohol without permission.

12         You will contribute to the costs of that program if

13    you can afford it.  If you can't afford it, then I will have

14    probation absorb that cost.  But if you're working, if you have

15    access to insurance, I'll ask that you help defray the cost of

16    that.

17         You will submit your person, your residence, your

18    place of business, your vehicle, your property, your computers

19    or offense or other devices to a search in the event that the

20    probation office believes there may be evidence of a crime or

21    evidence of a violation of the terms of your supervised

22    release.  That's not negotiable.  You have to submit to that

23    search when requested.

24         You have an obligation to tell others with whom you

25    resider or with whom you share these premises that are subject

1    to this search so they can take steps to protect their own

2    property and their own privacy.

3            You will participate in vocational and educational

4    courses as needed to make sure that you're able to get legal

5    employment that will allow you to support yourself and your

6    family.

7            I think that's it for the special conditions.  There's

8    a special condition of $200.  That was imposed last time.  I

9    will impose that again.

10           There was no restitution last time and no fine.  I'm

11   not going to impose that now either.

12           MR. ARTHUS:  We'll address the special assessment.

13   He's already satisfied it.  Actually I think with the 924(j)

14   being vacated, I think he's actually entitled to $100.

15           THE COURT:  If that's the case, then whatever he's

16   paid over the $200 should go to him.

17           To his commissary account?  Is that where he wants it?

18           MR. ARTHUS:  Yes, and I think that probably needs to

19   be on the judgment.

20           THE COURT:  Why don't you get back to me on that too

21   so I use language that is appropriate because that's $100 that

22   would be valuable in prison.

23           I should tell you, Mr. Gonzalez, you have a right to

24   appeal this sentence.  So if that's something you wish to do,

25   you certainly have the right to do that.  Talk to your lawyer

 1    about that.

 2            You have two weeks to file a notice of appeal.  That's

 3    a pretty strict deadline so make sure that you guys discuss

 4    whether you wish to file an appeal.

 5            I want to stress what I said before.  We spent a fair

 6    amount of time on the guidelines and how they apply here.  This

 7    is a sentence I would have imposed, regardless of how the

 8    guidelines crack up with respect to the cross-reference for

 9    murder.

10            It seems to me that the facts of this case and what

11    the jury found and from the evidence I heard at trial support

12    this sentence, even if the guidelines were the ones that are

13    proposed or were proposed by Mr. Arthus.

14            Every case is based on the facts presented, and in

15    this case, I think this is an appropriate sentence.  In any

16    event, if you wish to take an appeal, that's certainly your

17    right.

18            Is there something you wanted to say, Mr. Rehn?

19            MR. REHN:  Yes, your Honor.  Just so go back to when

20    you mentioned the 26-year term.  I think you described it as

21    being a 26-year term on both counts concurrent.

22            THE COURT:  It can't be that.  You're right.  It would

23    be 20 years on Count One and 6 years on Count Two.  But it's

24    really going to be different once I know how much time he's

25    gotten credit for.  So it will be probably more like 23 or 22

1  years, depending on what I learn.

2         MR. REHN:  Yes, your Honor.  I just wanted to make

3  sure it was clear.

4         THE COURT:  I'm glad you reminded me of that.  That's

5  right.

6         The supervised release will be concurrent.  But the

7  others will be cracked up so that there is a consecutive

8  component.  So it will be 20 plus whatever the balance of 26

9  minus time served is.

10        Is there anything else we should cover today,

11 Mr. Arthus?

12        MR. ARTHUS:  In terms of a designation, a recommended

13 designation, we would just ask if the Court would recommend a

14 designation back to USP Canaan.  He was doing well.

15        THE COURT:  I'll make that recommendation in the

16 strongest possible terms.  I can't order it, but I will

17 certainly make that recommendation.

18        Anything else from you, Mr. Rehn?

19        MR. REHN:  No, your Honor.

20        THE COURT:  Mr. Gonzalez, good luck to you.  I wish

21 you continued success and to your family as well.  Your

22 fortunate to have a family that cares about you and is here

23 for you today.  That's not true of everybody.

24        Your victim's family obviously doesn't have that

25 luxury.  Be mindful of that too.  I accepted your statements of

1   remorse, I think and that shows a maturity that was factored

2   into the sentencing reduction.  So good luck to you.

3        Let me thank the marshals, and let me thank the court

4   reporter as well.

5        (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25